NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAYAL MEHTA,<br>      Plaintiff,<br><br>v.<br><br>FAIRLEIGH DICKINSON UNIVERSITY<br>and DR. ROBERT MCGRATH,<br><br>      Defendants. | Civil Action No. 09-cv-0455 (SDW)<br><br><br>**OPINION**<br><br><br><br>February 9, 2012 |

**WIGENTON**, District Judge.

  Before this Court is Defendant Fairleigh Dickinson University ("FDU") and Dr. Robert McGrath's ("Dr. McGrath")(collectively "Defendants") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b). This Court, having considered the parties' submissions, decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, this Court **GRANTS** Defendants' motion.

I. **BACKGROUND**

  This matter involves Plaintiff Payal Mehta ("Plaintiff") and Defendants FDU and Dr. McGrath. Plaintiff was enrolled in FDU's Ph.D. Program in Clinical Psychology ("the Program"). Plaintiff resigned from the Program after Defendants' imposed remediations for violations of ethical standards. Plaintiff seeks to recover damages under the New Jersey Law Against Discrimination ("NJLAD") and 20 U.S.C. § 1681. In addition, Plaintiff seeks to recover

damages for breach of contract, defamation, negligence, and intentional infliction of emotional distress.  The issues before this Court are: (1) whether Defendants discriminated against Plaintiff on the basis of her sex and race and/or ethnicity in violation of NJLAD; (2) whether Defendants breached a contract with Plaintiff by imposing remediations; (3) whether Defendants defamed Plaintiff by stating that Plaintiff was a threat to public safety and that Plaintiff required professional therapy; (4) whether Dr. McGrath subjected Plaintiff to unwelcome sexual harassment; and (5) whether Defendants breached their duty of care to Plaintiff.

II.  **FACTS**

Plaintiff is an Indian female who became pregnant while she was enrolled in FDU's Program.  (Compl. ¶¶ 3-4.)  Students enrolled at FDU's program normally receive a copy of FDU's Program Policies and Procedures Manual ("Policies and Procedures Manual") which describes the Program requirements, standards for termination and/or remediation, and the applicable appeals procedure.  (Certification of Nicole Bearce Albano ("Albano Cert.") Ex. C.) During the Program, students participate in both academic courses and engage in a hands-on clinical component, also known as a practicum.  (*Id.* Ex. B, at 173-74; Ex. C, at 6.)  When students begin working at FDU's Center for Psychological Services ("Center"), they are provided with a copy of the Center's handbook as well as a similar document outlining procedures for work in the Adult Learning Disability & Attention Deficit Hyperactivity Disorder Clinic ("Adult LD & ADHD Clinic").  (*Id.* Ex. E, Ex. F.)  These documents identify guidelines for the day-to-day activities for students working in the Center including file maintenance, supervision, communication with clients, and completion of testing reports.  (*Id.*)  Specifically, the Adult LD & ADHD Testing Procedures state that students must contact their supervisor immediately after being assigned a case, and the supervisor must "acknowledge that they are

supervising [a student] before [the student begins]." (*Id.* Ex. F, at 9 ¶ 3.) Additionally, after the initial client meeting, students must contact their supervisor to discuss overall clinical impression, and to discuss any clinical concerns. (*Id.* Ex. F, at 12 ¶ 10.) Subsequent supervision, however, is arranged with each individual supervisor. (*Id.*) Finally, unless permission is granted, "all cases must be completed in 8 weeks from the date of initial contact." (*Id.* Ex. F, at 14 ¶ 17.)

Students are also bound by the Ethical Principles of Psychologists and Code of Conduct ("Ethical Guidelines") promulgated by the American Psychological Association ("APA"). (*Id.* Ex. G, at 2.) If a student is found to have violated the Ethical Guidelines, FDU may impose remediations of its choice, including termination. (*Id.* Ex. B at 175; Ex. C at 10.) During their second year in the Program, students are expected to be able to evaluate patients on their own; however, because students are unlicensed, they are required by law to work closely with faculty supervisors while caring for patients. (Certification of Robert McGrath ("McGrath Cert.") ¶¶ 12-13; *see also* Albano Cert. Ex. E, at 3.) As such, FDU has multiple, and sometimes competing, obligations to both educate students and to ensure the safety of patients in their care. (McGrath Cert. ¶ 14.)

A.   **Plaintiff's Participation in Adult LD & ADHD Clinic**

During Plaintiff's second year in the program, she participated in the Adult LD & ADHD Clinic at the Center. (Albano Cert. Ex. A, at 24-25.) Plaintiff was assigned two testing cases as part of her participation in the Clinic. (Certification of Benjamin D. Light ("Light Cert.") Ex. C, at 46:3-6, 107:7-13.)

3

1.      **Plaintiff's Failure to Provide Adequate Care to Patient 1**

Plaintiff was assigned an LD & ADHD testing case involving a law student from Pace University ("Patient 1") during the first week of March 2008.  (Light Cert. Ex. C, at 46:3-17.) Plaintiff contacted her supervisor, Dr. Ron Dumont, on March 4, 2008 to initiate supervision for Patient 1.  (Albano Cert. Ex. I.)  Dr. Dumont informed Plaintiff that she should proceed with testing.  (*Id.*)  Plaintiff administered tests to Patient 1 on March 7, March 20, and March 28.  (*Id.* Ex. H, at 2-3.)  Despite completing testing on March 28, Plaintiff did not contact Dr. Dumont to review test materials until June 11, 2008.  (*Id.* Ex. L, at 14:13-22.)  Plaintiff was delayed in executing her duties because she believed that there was no rush in finishing reports and that students could take their time to complete the cases.  (*Id.* Ex. A, at 67:19-23.)

After reviewing the materials provided by Plaintiff, Dr. Dumont determined that there were several errors in the scoring of the tests.  (*Id.* Ex. L, at 47:8-22.)  In early July 2008, Dr. Stefanie Ulrich, Director of the Center, received a call from Patient 1 who stated that she had not received a response from Plaintiff regarding the status of her testing report.  (*Id.* Ex. M.)  On July 9, 2008, Dr. Ulrich contacted Dr. Dumont, Dr. Lana Tiersky, Director of the Adult LD & ADHD Clinic, and Dr. McGrath, the director of Clinical Training for the Program, to inform them of the situation. (*Id.*)  Dr. McGrath contacted Plaintiff to set up a time for her to meet him and the other faculty members involved to discuss her performance.  (*Id.* Ex. N.)  A meeting was scheduled for July 15, 2008. (*Id.*)

2.      **July 15, 2008 Meeting to Discuss Plaintiff's Performance Regarding Patient 1**

At the July 15 meeting, Dr. McGrath explained that Plaintiff had committed serious violations of ethical standards and outlined a number of possible remediations that could occur, including termination from the Program.  (*Id.* Ex. J, at 30:20-25, 31:1-6.)  Following the meeting,

4

Plaintiff acknowledged in an e-mail to Dr. McGrath that the delay in completing Patient 1's report was a serious mistake on her part. (*Id.* Ex. O.) Plaintiff also informed Dr. McGrath that she was pregnant and stated that pregnancy related difficulties contributed to her delay in providing adequate patient care. (*Id.*)

### 3. Plaintiff's Failure to Provide Adequate Care to Patient 2

Plaintiff was also assigned a testing case regarding a second patient ("Patient 2") during the last week of January in 2008. (Light Cert. Ex. C, at 109:17-20.) Plaintiff states that she contacted Dr. Tiersky for supervision before February 1, 2008. (*Id.* Ex. C, at 110:2-25, 111:1-11.) Dr. Tiersky states that she was never formally informed that Plaintiff had been assigned the case or that she was supposed to supervise Plaintiff's care of Patient 2 until July 24, 2008, which was after the July 15 meeting, when Plaintiff contacted Dr. Tiersky requesting supervision. (Albano Cert. Ex. P.) Plaintiff began testing on Patient 2 on February 1, 2008 and completed testing on March 7, 2008. (*Id.* Ex. A, at 111-112; Ex. Q.) Plaintiff states that sometime in April 2008, she informed Dr. Tiersky that she had completed testing of Patient 2. (Light Cert. Ex. C, at 113:6-23.) Plaintiff's report on Patient 2 was finalized at the end of August 2008. (Albano Cert. Ex. R.) Plaintiff believed that there was no rush in finishing reports and that students could just "get to the cases when you can." (*Id.* Ex. A, at 117:7-12.) Plaintiff also identified her pregnancy as a reason for her delay in completing the report. (*Id.* Ex. A, at 117:13-25.)

### B. Defendant's Decision to Impose Remediations

Dr. McGrath contacted faculty members on August 5, 2008 to schedule a meeting on August 27, 2008 to discuss several student issues, including Plaintiff's violation of clinical policies in her treatment of Patient 1 and Patient 2. (*Id.* Ex. S.) Although Plaintiff had identified her pregnancy as a reason for her failure to provide adequate patient care, the Ethical Guidelines

5

identify standard procedures that a student must follow when personal problems interfere with patient care. (*Id.* Ex. A, at 117:13-25; Ex. G, at 2.06(b).) Plaintiff did not follow these procedures despite her difficulties in providing adequate patient care. (*Id.* Ex. A, at 118:4-7.) After learning of the meeting on August 27, 2008, Dr. Gibbs, Plaintiff's advisor, advised Plaintiff to gather as much information as possible to support her defense, including looking at the Clinic's files to see if any of her classmates were late in completing their cases. (Light. Cert. Ex. S, at 88:3-20.) Plaintiff copied Clinic records showing that other students in the Adult LD & ADHD Clinic took as long or longer to complete their assigned testing cases. (Certification of Payal Mehta ¶¶ 4-5.)

Following the faculty meeting on August 27, 2008, Dr. McGrath sent an e-mail to Plaintiff identifying proposed remediations. (Albano Cert. Ex. V.) The remediations included: (1) requiring Plaintiff to complete another clinical component of testing at the Center, and if her performance was deemed acceptable, she would return to a full course load the following year, (2) a strong recommendation that Plaintiff sit in on the practicum course again, and (3) a strong recommendation that Plaintiff consider the possibility of individual therapy to address her personal issues which may have contributed to her problems in the program. (Compl. ¶¶ 7-8; Albano Cert. Ex. V.) In addition, Dr. McGrath informed Dr. Cohen, the director of the Psychology Externship Program for Westchester Jewish Community Services that Plaintiff would not be participating in the externship due to violations of basic ethical standards. (Compl. ¶ 10; Albano Cert. Ex. W, at ¶¶ 5-6.)

On September 1, 2008, Dr. McGrath sent Plaintiff another e-mail stating that the faculty had decided to adopt the remediations which were proposed during the August 27, 2008 meeting and that further difficulties could result in termination from the Program. (Albano Cert. Ex. Z.)

After receiving Dr. McGrath's e-mail, Plaintiff reached the conclusion that continuing in the Program would be futile. (Light Cert. Ex. K.) Plaintiff did not appeal Defendants' decision to impose remediations and resigned from the Program on September 4, 2008. (Compl. ¶ 11; Albano Cert. Ex. AA.) Plaintiff subsequently enrolled in FDU's Master's program and obtained a degree in May 2010. (Compl. ¶ 11; Albano Cert. Ex. AA.)

III.  **LEGAL STANDARD**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). The court may not weigh the evidence and determine the truth of the matter but rather determine whether there is a genuine issue as to a material fact. *Anderson*, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in "a light most favorable" to the nonmoving party. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991). The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.*,

409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). If the nonmoving party "fail[s] to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

IV.  **DISCUSSION**

*NJLAD*

Plaintiff contends that the decision to impose remediations against her was based on her race and sex in violation of NJLAD[1]. To support her claim, Plaintiff contends that Dr. McGrath told her she would "only ever be able to work in an Indian community."[2] (Albano Cert. Ex. A at 149-50.) Plaintiff alleges that this statement was made in December 2007 during Plaintiff's semester evaluation by Dr. McGrath. (Light Cert. Ex. C at 151-52.) Regarding NJLAD claims, the Supreme Court has enumerated two tests when analyzing such claims, the *McDonnell Douglas* test, illustrated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), and the *Price Waterhouse* test, illustrated in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1994). The type of evidence proffered regarding the discriminatory conduct at issue dictates which test should be applied. Where a plaintiff produces direct evidence of the discriminatory conduct, the *Price Waterhouse* test must apply. *See McDevitt v. Bill Good Builders, Inc.*, 175 N.J. 519, 527 (2003). However, absent direct evidence the *McDonnell* test is applicable. *See McDonnell Douglas Corp.*, 411 U.S. at 805.

---

[1] It is unclear from the complaint whether Plaintiff's NJLAD claim for sexual discrimination is premised on a claim for an adverse action or sexually hostile environment. The NJLAD section of this opinion will discuss the possible adverse action premise and the Title IX section of this opinion will discuss the sexually hostile environment premise.
[2] Plaintiff also alleges in her opposition brief that Dr. Tiersky made an open racial bias statement at a faculty meeting; (*See* Pl.'s Br. 14.) However, Plaintiff's allegation will not be considered as it is untimely. *see Carr v. Gillis Assoc. Indus., Inc.*, 227 F. App'x. 172, 176 (3d Cir.2007) ("District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour.")

Here, the parties have a dispute as to whether the evidence proffered by Plaintiff constitutes direct evidence. "While courts agree on what is not direct evidence- e.g., statements by non-decisionmakers, statements by decisionmakers unrelated to the contested [] decision, and other 'stray remarks'-there is no consensus on what is [direct evidence]." *See, e.g.*, *Fernandes v. Costa Bros. Masonry*, 199 F.3d 572, 581-82 (1st Cir. 1999) (surveying circuit courts' different approaches); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736-37 (7th Cir. 1994) (defining and distinguishing acceptable forms of direct and circumstantial evidence in employment discrimination cases). However, under the approach applied by the Third Circuit, when determining if evidence should be considered direct, "a court must consider whether a statement made by a decisionmaker associated with the decisionmaking process actually bore on the [] decision at issue and communicated proscribed animus." *McDevitt*, 175 N.J. at 528 (citing *Fakete v. Aetna, Inc.*, 308 F.3d 335, 339 (3d Cir. 2002)). The direct evidence, if true, must "demonstrate not only a hostility toward members of the [complainant's] class, but also a direct causal connection between that hostility and the challenged [conduct]." *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 208 (1999).

Plaintiff contends that Dr. McGrath's statement to Plaintiff that she would only ever find work in the Indian community is direct evidence of discriminatory conduct. While such a statement would arguably demonstrate animus toward Plaintiff's class, which is Indian women, Plaintiff has not demonstrated that the statement at issue is causally connected to the challenged conduct. Plaintiff alleges that the statement was made in December 2007 during her semester evaluation, but fails to provide the context in which the statement was made. Given the date of Dr. McGrath's statement being eight months before Defendants' adverse action and the fact that Plaintiff did not provide any context for the statement, Plaintiff has failed to show that the

9

alleged hostility toward members of her class bore on the adverse decision at issue. *See Diaz v. Lezanski*, No. CIV.A. 9-223, 2011 WL 2115671 at *9 (D.N.J May 25, 2011) (where the court found that plaintiff's proffered evidence of defendant's statement constituted direct evidence where the statement was made around the time defendant was involved in taking the alleged adverse employment action against plaintiff). Since Plaintiff has failed to provide direct evidence, the *McDonnell Douglas* test applies.

Under the *McDonnell Douglas* test, Plaintiff has the burden to first demonstrate a prima facie case of discrimination. *See Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Once Plaintiff has made this showing, the burden shifts to Defendants who must articulate a legitimate, non-discriminatory reason for the decision at issue. *Id.* at 253. Finally, the burden shifts back to Plaintiff to demonstrate that Defendants' proffered explanation is pretextual, and that Defendants intentionally discriminated against her. *Id.* To establish a prima facie case of discrimination, Plaintiff must show that she: (1) belongs to a protected class, (2) was objectively qualified for a particular position (or in this case, met the university's legitimate expectations), (3) received an adverse action, and (4) other persons with similar qualifications or performance were treated differently. *See Viscik v. Fowler Equip. Co. Inc.*, 173 N.J. 1, 14 (2002).[3]

Defendants stipulate that regarding the first factor, Plaintiff belongs to a protected class as she is a female of Indian descent. (*See* Defs'. Br. 15.) Defendants also stipulate that regarding factor three, the fact that Plaintiff's course load was reduced can be characterized as an adverse action. (*Id.*) Defendants, however, contend that Plaintiff cannot satisfy the second and fourth prong of the *McDonnell* test. (*See id.*) Defendants contend that Plaintiff's course load

---

[3] In *Viscik*, the court stated that the *McDonnell* test was not designed for rigid application and that the prima facie elements should be tailored to the particular circumstances of the case.

was reduced: (1) because of Plaintiff's failures in caring for her two patients, (2) her failure to seek supervision in executing her duties, and (3) Plaintiff's failure to notify her supervisors of her personal problems that hindered her performance. (Defs.' Br. 15-6.) Regarding factor two, the facts do not lend to an interpretation that is diametrical to Defendants' contentions.

Regarding Patient 1, it is undisputed that Plaintiff completed testing in March 2008 and did not contact Dr. Dumont until June 2008. Plaintiff attempts to excuse her delay by stating that Patient 1 no longer needed the test results expediently. (*See* Light Cert. Ex. C, at 55:19-56:14.) While Plaintiff attempts to excuse her delay by relying on Patient 1's expectations, a patient's needs do not dictate Plaintiff's duties as a student. Therefore, Plaintiff fails to satisfy the second prong of the *McDonnell* test with regard to Patient 1.

Concerning Patient 2, there is a factual dispute. Defendants contend that Dr. Tiersky was not aware of Patient 2 and more importantly had not been contacted by Plaintiff regarding Patient 2 until July 2008 despite the fact that testing had been completed in March 2008. (Defs.' Br. 7.) Plaintiff, on the other hand, contends that Dr. Tiersky was aware of Patient 2 from the outset. (Pl.'s Br. at 5.) Also, Plaintiff contends that she contacted Dr. Tiersky regarding supervision in February 2008, in April of 2008 after testing was complete, and in July 2008. (*Id.*) Consequently, Plaintiff argues that there was not a seven-month delay in Plaintiff's completion of her assignment regarding Patient 2. (*Id.*) While there is a factual dispute regarding Plaintiff's performance concerning Patient 2, as discussed below, Plaintiff's inability to satisfy the fourth factor precludes Plaintiff from establishing a prima facie case of discrimination.

Plaintiff attempts to satisfy the fourth prong of the *McDonnell* test by providing evidence of three students who were also late in completing their final reports but suffered no adverse consequences from FDU. (*See* Pl.'s Br. 19.) While Plaintiff's evidence demonstrates that she is

11

not the only student to have taken longer than the allotted time to complete her final reports, nothing in the record establishes the race or gender of the students to whom Plaintiff refers. Furthermore, Plaintiff's argument does not take into account other aspects of her performance i.e., failure to seek supervision.  Without substantiating her assertion that other non-minority male students were similarly situated, Plaintiff cannot satisfy the fourth prong.

Since Plaintiff cannot satisfy the second and fourth factor of a prima facie discrimination claim, Plaintiff cannot meet its burden under the *McDonnell* test.  Therefore, summary judgment is granted regarding Count One.

*Sexual Discrimination*

Plaintiff alleges that , in violation of Title IX, she was "subject to unwelcome sexual harassment in that defendants declared routine pregnancy symptoms constituted mental health problems that required professional therapy and which rendered her unfit for continued participation in the program." (Compl. ¶ 24.)  To succeed on a Title IX claim, Plaintiff must demonstrate: "1) quid pro quo sexual harassment or a sexually hostile educational environment; 2) that she provided actual notice to 'an appropriate person' who had authority to take corrective measures; and 3) that the institution's response to the harassment amounted to deliberate indifference."  *Gebser v. Lago Vista Indep. School District*, 524 U.S. 274, 291–92 (1989). [4]  "To succeed on a sexually hostile environment claim, a plaintiff must demonstrate that she suffered intentional discrimination because of her sex, the discrimination was pervasive and regular, the discrimination detrimentally affected her, and the discrimination would have detrimentally affected a reasonable person of her sex in her position." *Bennett v. Pa. Hosp. Sch. of Nurse*

---

[4] Given the facts alleged, this Court interprets Plaintiff's Title IX claim as a sexually hostile environment claim as opposed to a claim for *quid pro quo* sexual harassment.

*Anesthesia*, No. CIV.A. 01–CV–4098, 2002 WL 32341792 at *3 (E.D.P.A. Oct. 29, 2002) (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).

In light of the facts alleged by Plaintiff, it does not appear that Plaintiff would be able to prevail on a Title IX claim because Plaintiff would not be able to establish a sexually hostile environment. First, regarding intentional discrimination, the statement made by Dr. McGrath is not arguably sufficient to constitute intentional discrimination. Second, Plaintiff would not be able to show that any intentional discrimination was regular and pervasive as Plaintiff states in her opposition brief that "she never had any trouble with FDU, either academically or ethically" prior to the current dispute. (*See* Pl.'s Br. 4.) Also, Plaintiff would not be able to show that the type of discrimination alleged detrimentally affected her as she voluntarily withdrew from the Program at FDU and was able to continue her education at FDU, albeit in FDU's Master's program. Finally, this Court does not need to address the last factor since Plaintiff cannot establish the third factor.

Since there is no dispute of material fact as to whether Plaintiff can establish a Title IX claim, Summary Judgment is granted regarding Count Four.

*Breach of Contract*

New Jersey recognizes an implied agreement between students and institutions of higher education. *See Mittra v. Univ. of Med. And Dentistry of N.J.*, 316 N.J. Super. 83 (App. Div. 1998). However, New Jersey law mandates that "the relationship between [a] university and its students should not be analyzed in purely contractual terms." *Id.* at 85. Additionally, New Jersey law rejects "the rigid application of contractual principles to university-student conflicts involving academic performance." *Id.* at 90. (citing *Napolitano v. Trustees of Princeton Univ.*, 186 N.J. Super. 548 (App. Div. 1982)). Further, New Jersey law, in accordance with Supreme

Court precedent, takes the position that the courtroom is not the proper forum for academic disputes. *Id.* Instead, "[s]imilar to the decision of a professor as to the proper grade [a student should receive], the determination [of] whether to dismiss a student for academic reasons 'requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision-making.'" *Id.* at 91 (citing *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978)). "A graduate or professional school is surely the best judge of its students' academic performance and her ability to master the required curriculum." *Id.* (citing *Horowitz*, 435 U.S. at 85 n. 2). Students, however, are not left unprotected. When evaluating the validity of a student's dismissal, New Jersey law requires a student to receive "reasonable notice and a fair hearing in general conformity with the institution's rules and regulations." *Id.* at 85.

     Here, Plaintiff argues that contract principles should be applied to the relationship between her and FDU and that the adverse decision at issue is reviewable because it was ethical as opposed to academic in nature. (Pl.'s Br. 23-4.) Plaintiff's argument fails on both grounds. In arguing that contract principles should be applied to her relationship with FDU, Plaintiff relies on the ruling in *Beukas v. Bd. of Trustees of Fairleigh Dickinson Univ.* 255 N.J. Super. 552 (Law. Div. 1991). In *Beukas*, the Appellate Division applied quasi-contract principles in deciding whether a university could administratively close one of the colleges or terminate a college program for financial reasons. *See generally Beukas*, 255 N.J. Super. 552. However, the *Beukas* court "took pains to distinguish" the issue in that case from questions pertaining to issues regarding the exercise of academic business judgment. *Mittra*, 316 N.J. Super. at 91 (citing *Beukas*, 255 N.J. Super. at 561). Therefore, Plaintiff's reliance on *Beukas* is misplaced. New

14

Jersey law is clear regarding the application of contract principles to the relationship between a student and an institution of higher education.

Regarding Plaintiff's contention that Defendants' decision was ethical as opposed to academic in nature, the Supreme Court established in *Horowitz* that the evaluation of a student's clinical work "is no less an 'academic' judgment because it involves observation of her skills and techniques in actual conditions of practice rather than assigning a grade to her written answers on an essay question." *Horowitz*, 435 U.S. at 95 (Powell concurring) (footnote omitted). Therefore, Plaintiff's argument fails on this ground as well.

Regarding FDU's compliance with the need to provide Plaintiff with reasonable notice and a fair hearing pursuant to FDU's policies and procedures, the facts demonstrate that FDU's process in reaching its decision was fair. The Policies and Procedures Manual requires: (1) a student to be notified of problems identified with the student, and (2) to be given an opportunity to consult with the faculty member(s) involved. (*See* Albano Cert. Ex. C at 4.)[5] Also, remediation plans, after being prescribed by the faculty member(s) involved, are to be presented to the student in written form. (*See id.*) FDU notified Plaintiff both in person at a meeting on July 15, 2008, and via email of her alleged deficiencies. (*See* Albano Cert. Ex. N, Ex. O.) Plaintiff was also given an opportunity to respond to the allegations before any remediation was finalized, but failed to take advantage of that opportunity. (McGrath Cert. ¶¶22-4.) Regarding the right to a fair hearing, FDU policies and procedures allow a student to appeal a remediation decision. (*See* Albano Cert. Ex. C, at 11.) However, Plaintiff did not avail herself of the appeals process at FDU. (Albano Cert. Ex. AA.)

---

[5] Plaintiff contends that (1)Defendants have provided no evidence that all students received the Policies and Procedures Manual and (2) the Policies and Procedures Manual that has been provided by Defendants is not authentic as it is the 2010 version and not the 2008 version. Plaintiff's arguments do not suffice to preclude summary judgment. Plaintiff's arguments fail to create a genuine issue of material fact. Therefore, Plaintiff's allegations are irrelevant for purposes of this Court's analysis.

Seeing as how contract principles are inapplicable to the relationship between the parties, FDU's remediation was academic in nature, and the necessary precautionary measures were taken regarding FDU's remedial actions, summary judgment is granted regarding Count Two.

*Defamation*

For Plaintiff to prevail on her defamation claim, she must establish that Defendants: "(1) made a defamatory statement of fact (2) concerning the plaintiff (3) which was false and (4) which was communicated to a person or persons other than the plaintiff." *Feegans v. Billington*, 291 N.J. Super. 382, 390-91 (App. Div. 1996). In addition, Plaintiff must prove fault and establish damages. *Id.* at 391. A statement is defamatory if it is false and injures the reputation of another; or subjects another person to hatred, contempt, or ridicule; or results in a loss of the good will and confidence in that person. *Romaine v. Kallinger*, 109 N.J. 282, 289 (1988) (quoting *Leers v. Green*, 24 N.J. 239, 251 (1957)). Stated differently, a defamatory statement "tends so to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Restatement (Second) of Torts § 559* (1977).

Courts must initially determine "whether [an allegedly defamatory statement] is reasonably susceptible of a defamatory meaning." *Romaine*, 109 N.J. at 290 (citing *Kotlikoff v. The Community News*, 89, N.J. 62, 67 (1982)). This is a question of law to be decided by the presiding court. *Lawrence v. Bauer Publ'g & Printing Ltd.*, 89 N.J. 451, 459 (1982). When making this determination, the court must construe the words in question "according to the fair and natural meaning which will be given them by reasonable persons of ordinary intelligence." *Dressler v. Mayer*, 22 N.J. Super. 129, 135 (1952). However, the court must "examine the publication as a whole." *Cibenko v. Worth Publ's, Inc.*, 510 F. Supp. 761, 764 (D.N.J. 1981).

A statement is libelous as a matter of law if the published statement is capable of only one meaning, and that meaning is defamatory. *Mosler v. Whelan*, 28 N.J. 397, 405 (1958). Conversely, a statement cannot be considered libelous, and dismissal of the action is therefore justified, if a statement is only capable of a non-defamatory meaning. *Cibenko*, 510 F. Supp. at 764-65. However, in cases where the statement is capable of both defamatory and non-defamatory interpretations, the trier of fact must determine whether its content is defamatory. *Lawrence*, 89 N.J. at 459.

Here, Plaintiff alleges that Dr. McGrath made defamatory statements about her when he made statements to members of the faculty and the director of the externship facility that Plaintiff was a "threat to public safety." (Compl. ¶ 21.) Plaintiff's argument fails for two reasons. First, Dr. McGrath's statement to other faculty members and to Dr. Cohen that Plaintiff was a threat to public safety is not reasonably susceptible of a defamatory meaning given the context of the statement. In construing the words according to their fair and natural meaning and examining the publication as a whole, the statement refers to Defendants' obligation to ensure the safety of patients in FDU's care and the Plaintiff's breach of that obligation by failing to meet several requirements of her clinical duties. Second, Plaintiff cannot succeed on her defamation claim regarding Dr. McGrath's statements because the statement was not communicated to a person or persons other than the Plaintiff. (Albano Cert. Ex. A, at 138:3-7.)

Plaintiff also alleges that Dr. McGrath defamed Plaintiff by telling her she required professional therapy. (Compl. ¶ 21.) In an e-mail to Plaintiff dated August 27, 2008, Dr. McGrath stated that the faculty strongly recommended that Plaintiff consider the possibility of individual therapy to address how personal issues could have contributed to Plaintiff's problems in the Ph.D. program. (Albano cert. Ex. V.) In examining the publication as a whole and

construing the words "according to the fair and natural meaning which will be given them by reasonable persons of ordinary intelligence," this Court determines that the statement is not capable of a defamatory meaning. *Dressler*, 22 N.J. Super. at 135. When taken in context of Plaintiff's email to Dr. McGrath dated July 17, 2008 in which Plaintiff stated that her pregnancy significantly contributed to her delayed completion of program requirements, the faculty's recommendation to Plaintiff that she consider individual therapy was not a defamatory statement. (Albano cert. Ex. O.) The statement was made pursuant to the American Psychological Association's Ethical Principles of Psychologists and Code of Conduct which states that "[w]hen psychologists become aware of personal problems that may interfere with their performing work-related duties adequately, they take appropriate measures, such as obtaining professional consultation or assistance, and determine whether they should limit, suspend, or terminate their work-related duties." (Albano cert. Ex. G, at 5:2.06(b).) Examining the e-mail as a whole, Dr. McGrath's statement is only capable of a non-defamatory meaning. Again, because a third party was not present during Plaintiff's meeting with Dr. McGrath on August 27, 2008, the statement was not published and therefore he cannot be liable for his statement. (Albano cert. Ex. A, at 153:7-20.)

Since Dr. McGrath's statements are only capable of a non-defamatory meaning when taken in context, the statements cannot be considered libelous.[6] As such, dismissal of the Plaintiff's defamation claim is proper, summary judgment for Count Three is granted.

---

[6] Plaintiff also alleges for the first time, in response to Defendants' motion for summary judgment, that Dr. Tiersky and Dr. Dumont also made defamatory statements. (Pl.'s Br. 25-6.) This Court will not consider defamatory statements, not alleged in the complaint, that were asserted for the first time in opposition to a motion for summary judgment. *Minerva Marine, Inc. v. Spiliotes*, No. 02-2517, 2005 U.S. Dist. LEXIS 41854, at *13 (D.N.J. Apr. 4, 2005). If the allegedly defamatory statements were made before the complaint was filed, "plaintiff should have described these statements in the complaint," and if Plaintiff later uncovered such statements, "Plaintiff should have moved to amend the defamation claim to include such statements." *Id.* As such, "to the extent Plaintiff seeks to rely on statements not mentioned in the Complaint as the basis for its defamation claim, this Court will not now consider them." *Id.*

18

*Negligence*

Plaintiff alleges that Defendants are liable for negligence because Defendants breached their duty of care to Plaintiff to "appropriately supervise her participation in the Program, including but not limited to her administration of tests to patients" and "to ensure that she was treated fairly." (Compl. ¶ 29.) To sustain a common law cause of action in negligence, a plaintiff must prove: "(1) [a] duty of care, (2) [a] breach of [that] duty, (3) proximate cause, and (4) actual damages [.]" *Weinberg v. Dinger*, 106 N.J. 469, 484 (1987) (citing *W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on the Law of Torts*, § 30 at 164–65 (5th ed. 1984)). Here, Plaintiff cannot prove negligence because Plaintiff cannot establish that Defendants owed her a duty. Plaintiff argues that pursuant to N.J.S.A. 45:14B-6(c) and N.J.A.C. 13:42-1.4 Dr. Tiersky and Dr. McGrath had a duty to ensure supervision of a psychology student. (Pl.'s Br 28). However, as Defendants have noted, under New Jersey law it is a well settled principle that "the violation of a legislative standard of conduct may be regarded as evidence of negligence if the plaintiff was a member of the class for whose benefit the standard was established." *Alloway v. Bradlees, Inc.*, 157 N.J. 221, 236 (1999). N.J.S.A. 45:14B-6(c) is part of the Practicing Psychology Licensing Act (the "Act"). The act, including N.J.S.A. 45:14B-6(c), was enacted for the benefit of patients. *See* N.J.S.A. 45:14B-42 (2012). Accordingly, Plaintiff cannot be a member of the class for whose benefit the Act was established. Additionally, N.J.A.C. 13:42-1.4 does not provide a standard of conduct, but instead merely names which persons require licensure in order to practice psychology. *See* N.J. ADMIN. CODE. 13:42-1.4 (2012).

Since Plaintiff's negligence claim fails as matter of law, summary judgment regarding count five is granted.

*NJLAD Anti-Retaliation & Intentional Infliction of Emotional Distress*

Plaintiff introduced a NJLAD Anti-Retaliation claim in her opposition brief to this Motion.  Defendants argue that Plaintiff's new argument is barred as Plaintiff introduced this claim at the summary judgment stage.  Indeed, it is well-established that "adding claims to a pleadings [sic] is properly done by amending the complaint; it is too late to introduce an additional claim at the summary judgment stage." *Tirone v. Trella*, No. 03–257, 2007 WL 3170098, at *6 (D.N.J. Oct. 29, 2007); *see also Carr v. Gillis Assoc. Indus., Inc.*, 227 F. App'x. 172, 176 (3d Cir.2007) ("District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour.").  Therefore, Plaintiff's NJLAD Anti-Retaliation claim is barred.

Plaintiff has agreed to dismiss her claim for intentional infliction of emotional distress. Accordingly, this Court need not reach this issue.

**CONCLUSION**

For the reasons stated above, Defendants' motion for summary judgment is **GRANTED.**

s/Susan D. Wigenton, U.S.D.J.


Orig:   Clerk
Cc:     Madeline Cox Arleo, U.S.M.J.
        Parties